## Case No. 9,200.

### The MARY BELLE ROBERTS.

[3 Sawy. 485.] [1]

District Court, D. California. Sept. 30, 1875.

SEAMEN'S WAGES—ABANDONMENT IN FOREIGN PORT.

Defense by master that the seaman was detained on shore by the municipal authorities of the port: *Held*, unsupported by the proofs.

In admiralty.

D. T. Sullivan, for libellant.

Millon Andros, for claimant.

HOFFMAN, District Judge. The libel, in substance, alleges that the libellant, who was a seaman on board the above vessel, was abandoned and left behind by the master thereof at Iquiqui, in the republic of Peru, the libellant being then on shore on liberty, and willing and anxious to return on board. The answer was, that the libellant was taken out of the vessel by order of the captain of the

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

port of Iquiqui without the consent and against the wishes of her master; that the master requested the captain of the port to allow the libellant to rejoin the barque, but the captain of the port refused so to do, and the vessel thereupon sailed away without the libellant. The answer further alleges that libellant was not prevented from rejoining the ship by any act of the master, but by the act of the harbor authorities of said port, and not otherwise.

The evidence shows, that on the day previous to the sailing of the vessel, a dispute occurred between the libellant and the master, in consequence of which the former was, by the master's order, put in irons, and, as he alleges, "triced up." The next morning he requested leave to go ashore to see the captain of the port. This the master refused, until he should first have seen the captain. The master accordingly went ashore about nine o'clock in the morning, saw the captain of the port, and, as he says, "told him just how the thing was."

The captain of the port had, it would seem, already heard of the affair through some workmen and the master insists that he made no complaint against the seaman. By his own admission, however, he voluntarily sought the captain and related the whole occurrence. The result was that a boat with a policeman on board was dispatched to the vessel and the libellant brought ashore. The master testifies that this occurred about nine o'clock a. m., and in this he is corroborated by the mate. The libellant states very positively that he was taken ashore after dinner and between two and three o'clock, and David Oakshott, a seaman, testifies to the same effect. The point is not very material except as showing that the man was taken ashore not more than an hour and a half before the vessel sailed, and as tending to show that little opportunity was afforded him to rejoin the ship, and no very strenuous effort was made to recover him.

The libellant states that on landing he saw the master on the mole, and said to him that he desired to see the captain of the port. The master showed him his office, and not finding him in, said he would go up town and see where he was. He did so, and on his return informed the libellant that the captain would be down within half an hour. The master then returned to his vessel and the libellant waited for the return of the captain of the port. On his arrival the libellant informed him that he belonged to the vessel which he saw was beginning to make sail. The captain told him he must wait until the master came ashore again. The libellant then offered a boatman one dollar to put him on board. The captain of the port said something to the boatman, or to a policeman that was near, which the libellant did not understand. The boat proceeded a short distance towards the ship and then turned around and brought the libellant back, notwithstanding that he offered three dollars to be put on board the vessel.

The ship continued her course out of the harbor without stopping.

The master's account of the occurrence differs from that of the man in a few particulars: 1. He states, as already noticed, that the man was brought ashore at nine o'clock, and not at about half past two or three, shortly before the vessel sailed. He denies having told the man he would go up town to look for the captain of the port, and states that he told the latter several times that he was about to sail and wanted the man, but the captain refused to give him up, saying he would look out for him, and would put him in jail. The captain made no investigation and assigned no reason for keeping the man. The master then returned to the vessel and was under way in fifteen minutes after he got on board. With respect to this statement it is to be observed: 1. That assuming it to be true, the master's justification is by no means clear.

The policy of the laws of all maritime nations, and notably of the United States, discountenances in the most emphatic manner the discharge of seamen in foreign ports. By various acts of congress, it is provided that the master shall, before sailing, give bond for the return of his crew to the United States. If a seaman be discharged abroad, he is in general required to pay to the consul three months' extra wages, of which two-thirds are to be paid to the seaman upon his engagement on board any vessel to return to the United states; the remaining third to be retained to form a fund for the payment of the expenses home of other destitute seamen. Consuls are also required to provide passages to the United States for any destitute American seamen found within their districts. Masters are required to receive on board their vessels, and transport to the United States, on the request of the consul, such seamen in number not exceeding two to every one hundred tons burden of their vessels. And, finally, the malicious forcing on shore, or leaving behind, of any mariner in any foreign port or place is denounced and punished as a crime.

These various provisions clearly exhibit the deep solicitude of the legislature to secure in all cases the return of the mariner to the United States, and they indicate with equal clearness the duty of the master, viz., to bring back the mariner in his vessel, unless the circumstances are such as to render it impossible, or to relieve him from the obligation to do so.

It is not pretended that in the case at bar the master had any right to expel the seaman from the vessel. The defense rests upon the allegation that the seaman was in the custody of the local authorities from which the master was unable to liberate him. But the inquiry arises, did the master, on his own showing, make a reasonable and sincere effort to perform what, as we have seen, the law regards as one of his most important duties.

The man, he says, was brought on shore at nine o'clock; the vessel sailed at three p. m.

He had been sent for by the captain of the port without any complaint on the part of the master, as the latter asserts. But he admits that he went to the captain of the port and "told him just how the thing was." It is not to be presumed that his narrative was very favorable to the seaman. The captain of the port at once dispatches a policeman to bring him ashore. To this proceeding the master makes no opposition. The man is brought on shore, and the master, as he says, requested the captain of the port "several times" to give up the man; and on his refusal, and without delaying his intended departure a single hour, sails away, leaving the man without clothes or money in a remote foreign port. I cannot consider that the master, under these circumstances, fulfilled his whole duty. A more resolute effort should have been made, and more decided measures taken, to procure the restoration of the man, and the departure of the vessel reasonably delayed for the purpose. I have little doubt that such an effort would have been successful. Had the man been a relative or ward of the master, or had a valuable bale of merchandise been removed from the ship, the master's reclamations would, I doubt not, have been far more energetic and persistent, nor would he have deemed the reasons he now assigns for not bringing back the man to his port of shipment a valid excuse for failing to deliver any part of his cargo to its owner. I consider his duty to restore the seaman to his home quite as imperative as his duty to deliver his cargo to its consignees.

If the account of the transaction given by the libellant be accepted, the master's breach of duty can hardly be denied. The man swears that he was taken on shore not more than an hour and a half before the vessel sailed; that when the master went off to the ship he said he would be back in half an hour; instead of doing so, he at once made sail. He denies that he was in custody, and states that when he discovered the vessel was about to sail, and mentioned it to the captain of the port, the latter told him to wait until the master came ashore. The man was certainly sufficiently at liberty to be able to make an effort to reach the vessel in a boat. But the boat, after proceeding a part of the way, turned back, against the remonstrances of the man, and in pursuance, he thinks, of previous instructions by the captain of the port. This circumstance seems to me extremely suspicious. It suggests very strongly the idea of a secret understanding between the master and the captain of the port, by which the former was to be rid of the man—an idea, favored by the facts that the master had had trouble with him, and had received on board two stowaway seamen by whom the libellant's place could be supplied. On the master's statement, the conduct of the captain of the port is unaccountable. The man had committed no violation of the municipal law of the place. The vessel lay a mile from the shore. A difficulty, such as are unhappily too common on board

ships, had occurred between the master and one of the men. The offense, if any, was against the discipline and internal police of the ship. What motive had the captain of the port to seize and hold the man, when the master had made no complaint against him, when he was anxious to receive him back, and the man was desirous of returning, and this without any investigation whatever into the facts of the case? None has been suggested, except the mere wantonness of brief authority. I require more convincing proofs than have been furnished in this case, to induce me to believe that from such a motive, without any personal interest or hope of advantage to himself, an officer charged with important duties in a foreign port, and who was on friendly terms with the master (for the latter testifies that he shook hands with him, and bade him good-bye when he left), would have been guilty of so high-handed an outrage upon the commerce of the United States. If the master really supposed the officer was committing the offense he now charges upon him, the cordiality of his leave-taking is not a little extraordinary. Nor does the subsequent conduct of the captain of the port toward the man in any degree tend to corroborate the master's version of the occurrence. On the man's return from his unsuccessful attempt to reach the vessel, he was not consigned to a jail, or subjected to the slightest restraint of his liberty. He applied at once to the captain of the port for a passage to San Francisco, but this the latter declared himself unable to afford him; but when some six days afterwards the man procured a passage on a mail boat for Callao, the captain of the port gave him a letter to the American consul at the latter place, who paid his board while at Callao, and gave him, on his departure, a letter to the consul at Panama, by whom, in like manner, his board was paid until a passage to San Francisco could be obtained.

It seems highly improbable that an officer who was thus ready to do everything in his power to facilitate the man's return to his country, would have forcibly taken him from the vessel and detained him in custody against his own wishes, and in spite of the remonstrances of the master. After a careful consideration of the whole case, my opinion is, that the master desired to be rid of the man, and voluntarily abandoned him. And the defense now set up that he yielded to authority he was unable to resist, is not sustained by the proofs.

In this view of the case, it is unnecessary to consider whether if the facts had been as alleged by the master, the seaman would not still have been entitled to his wages up to the end of the voyage. A decree will be entered in favor of libellant for his wages up to the end of the voyage, and his expenses, deducting intermediate earnings, if any.